# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

UNITED STATES OF AMERICA                                                          PLAINTIFF

v.                                    NO. 4:09CR00265 WRW/HDY

GEORGE WYLIE THOMPSON,                                                          DEFENDANTS
CARY L. GAINES, and
SAMUEL G. BAGGETT

UNITED STATES OF AMERICA                                                          PLAINTIFF

v.                                    NO. 4:09CR00305 JLH/HDY

GEORGE WYLIE THOMPSON and                                                    DEFENDANTS
RALPH F. DELEO

UNITED STATES OF AMERICA                                                          PLAINTIFF

v.                                    NO. 4:10CR00094 JMM/HDY

GEORGE ALLEN THOMPSON                                                            DEFENDANT

## FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following recommended disposition has been sent to the following United States District Judges:

(1) to United States District Judge William R. Wilson, Jr., in United States of America v. George Wylie Thompson, Gary L. Gaines, and Samuel G. Baggett, 4:09CR00265 WRW;

(2) to United States District Judge J. Leon Holmes in United States of America v. George Wylie Thompson and Ralph F. Deleo, 4:09CR00305 JLH; and

(3) to United States District Judge James M. Moody in United States of America v. George Allen Thompson, 4:10CR00094 JMM.

Any party may serve and file written objections to these findings and recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the Office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendation. The copy will be furnished to the opposing party. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The details of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, Arkansas 72201-3325

RECOMMENDED DISPOSITION

INTRODUCTION.   The defendants in United States of America v. George Wylie Thompson, Cary L. Gaines, and Samuel G. Baggett, 4:09CR00265 WRW, the defendants in United States of America v. George Wylie Thompson and Ralph F. Deleo, 4:09CR00305 JLH, and the defendant in United States of America v. George Allen Thompson, 4:10CR00094 JMM, have filed separate motions to suppress, all six of which have been referred for recommended disposition.  One or more of the defendants have adopted the reasons for suppression advanced by the other defendants.  Because this overlap exists, the undersigned has elected to address the motions in a single recommended disposition.

FIRST THOMPSON WIRETAP.  At some point, the Government learned of an alleged illegal gambling business involving George Wylie Thompson ("Thompson").[1]   The Government eventually submitted an application for an order authorizing a wiretap of his cell phone, an application supported by an affidavit from FBI Special Agent Gerald Spurgers ("Spurgers").  A summary of his affidavit will not be attempted; instead, the undersigned simply makes note of several of his representations.  He named Thompson and his son, George Allen Thompson, as among the interceptees and violators but did not name Cary L. Gaines ("Gaines"), Samuel G. Baggett ("Baggett"), or Ralph F. Deleo ("Deleo").  Spurgers identified the following subject offenses:

---

[1]

George Wylie Thompson will be identified simply as "Thompson" throughout the recommended disposition; his son George Allen Thompson will be identified by his full name.

> The telephonic communications to be intercepted are expected to concern offenses … involving: (i) conducting, financing, managing, supervising, directing, or owning all or part of an illegal gambling business …; (ii) conspiracy to conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business …; [and] (iii) money laundering … (hereinafter the "SUBJECT OFFENSES").

See 4:09CR00265, Document 105, Volume 1, Applications/Order Tab, December 2, 2008, Affidavit of Gerald Spurgers at 3.  Spurgers set forth the probable cause to support the wiretap, facts that were largely derived from physical surveillance, pen register analysis, toll records, and two cooperating witnesses.  With regard to the necessity of the wiretap, he represented that it was the only available investigative technique that had a reasonable likelihood of securing the necessary evidence and, in support of that assertion, he addressed the use, or lack of use, of other investigative techniques.  With regard to minimization, he represented, in part, the following:

> All interceptions will be minimized in accordance with Chapter 119 of Title 18, United States Code.  Interception will be suspended immediately when it is determined … that the INTERCEPTEES, when identified, are not participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  Even if one or more of the INTERCEPTEES, or their associates, … are participants in the conversation, monitoring will be suspended if the conversation is not criminal in nature, or otherwise related to the offenses under investigation.  Intermittent spot monitoring will be utilized to ensure that the minimized conversation has not become criminal in nature.  …

See Id. at 62.

On December 2, 2008, United States District Judge Brian S. Miller authorized the wiretap of Thompson's cell phone.  The order authorizing the wiretap largely conformed to the representations contained in Spurgers' affidavit.  Judge Miller specifically found, inter alia, that there was probable cause to believe that Thompson and his son, George Allen Thompson, were among the individuals engaged in the subject offenses identified by Spurgers; that Thompson's cell phone, identified in the order as the "target telephone," was being used in connection with the commission of the subject offenses; and that normal investigative techniques had been tried and failed, or reasonably appeared to be unlikely to succeed in achieving all the objectives of the investigation, or were too dangerous to employ.  With regard to the minimization of non-criminal conversations, Judge Miller ordered the following:

> Monitoring of wire communications must terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code.  Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the INTERCEPTEES FOR **Target Phone 1** or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overhead that the conversation is criminal in nature.  If the conversation is minimized, the monitoring individual shall spot check to ensure that the conversation has not turned to criminal mattes.  Special attention will be given to minimize all privileged communications.

See 4:09CR00265, Document 105, Volume 1, Applications/Order Tab, December 2, 2008, order of Judge Miller at 5-6.

On December 15, 2008, and again on December 24, 2008, the Government filed separate ten day progress reports.  They provided a summary of the evidence obtained by means of the wiretap and represented that evidence of additional criminal activity had come to light, criminal activity that included illegal firearms and the distribution of cocaine.

SECOND THOMPSON WIRETAP.  The first Thompson wiretap expired after thirty days, and the Government returned to Judge Miller seeking a second wiretap of Thompson's cell phone.  The application was again supported by an affidavit from Spurgers.  His second affidavit was substantially similar to his first affidavit as to his belief that Thompson's cell phone was being used in connection with the commission of the subject offenses, as to the probable cause for the wiretaps, as to the necessity of the wiretaps and the failure of other investigative techniques, and as to the steps the Government would take to minimize all conversations of a non-criminal nature.  His second affidavit was not, however, identical to his first affidavit as his second affidavit contained additional representations built primarily upon evidence acquired by means of the first wiretap.  The two most notable differences in the affidavits were the following representations: (1) he proposed to expand the list of subject offenses to include activities related to illegal firearms and the distribution of cocaine; and (2) he named Thompson, his son George Allen Thompson, Gaines, Baggett, and Deleo as among the interceptees and violators.

On January 5, 2009, Judge Miller authorized the second wiretap of Thompson's cell phone. The order authorizing the wiretap largely conformed to the representations contained in Spurgers' second affidavit. Judge Miller specifically found, <u>inter alia</u>, that there was probable cause to believe that Thompson, his son George Allen Thompson, Gaines, Baggett, and Deleo were among the individuals engaged in the subject offenses identified by Spurgers in his second affidavit; that Thompson's cell phone was being used in connection with the commission of the subject offenses; and that normal investigative techniques either failed, appeared unlikely to succeed, or were too dangerous to employ. Judge Miller again ordered that conversations of a non-criminal nature be minimized, the specifics of that provision being substantially similar to the minimization provision contained in his first order.

On January 16, 2009, and again on January 26, 2009, the Government filed separate ten day progress reports. They provided a summary of the evidence obtained by means of the second Thompson wiretap and represented that evidence of additional criminal activity had come to light, criminal activity that included extortionate credit transactions, prostitution, and visa fraud.

<u>THIRD THOMPSON WIRETAP</u>. The second Thompson wiretap expired after thirty days, and the Government returned to Judge Miller seeking a third wiretap of Thompson's cell phone. The application was again supported by an affidavit from Spurgers. The affidavit was substantially similar to his first two affidavits as to his belief

that Thompson's cell phone was being used in connection with the commission of the subject offenses, as to the probable cause for the wiretaps, as to the necessity of the wiretaps and the failure of other investigative techniques, and as to the steps the Government would take to minimize all conversations of a non-criminal nature. His third affidavit was not, however, identical to his first two affidavit as his third affidavit contained additional representations built primarily upon evidence acquired by means of the first two wiretaps. One notable difference between the first and second affidavits and the third affidavit was that he proposed to expand the list of subject offenses to include extortionate credit transactions, visa fraud, and harboring illegal aliens.

On February 3, 2009, Judge Miller authorized the third wiretap of Thompson's cell phone. The order authorizing the wiretap largely conformed to the representations contained in Spurgers' third affidavit. Judge Miller specifically found, <u>inter alia</u>, that there was probable cause to believe that Thompson, his son George Allen Thompson, Gaines, Baggett, and Deleo were among the individuals engaged in the subject offenses identified by Spurgers in his third affidavit; that Thompson's cell phone was being used in connection with the commission of the subject offenses; and that normal investigative techniques either failed, appeared unlikely to succeed, or were too dangerous to employ. Judge Miller again ordered that conversations of a non-criminal nature be minimized, the specifics of that provision being substantially similar to the minimization provision contained in his first order.

On February 13, 2009, and again on February 23, 2009, the Government filed separate ten day progress reports.  They provided a summary of the evidence obtained by means of the third Thompson wiretap and represented that evidence of additional criminal activity had come to light.

FIRST GAINES WIRETAP.  Following the expiration of the third Thompson wiretap, the Government submitted an application for an order authorizing a wiretap of Gaines' cell phone as he was believed to be using it in connection with additional criminal activity.  The application was supported by an affidavit from FBI Special Agent Rodney Hays ("Hays").  A summary of his affidavit will not be attempted; instead, the undersigned simply makes note of several of his representations.  He named Thompson and Gaines as among the interceptees and violators but did not name Thompson's son, Baggett, or Deleo.  Hays identified the subject offenses as mail fraud, wire fraud, bribery of a public official, and conspiracy to commit the aforementioned offenses.  He set forth the probable cause to support the wiretap, facts that were derived from several sources. With regard to the necessity of the wiretap, he represented that it was the only available investigative technique that had a reasonable likelihood of securing the necessary evidence and, in support of that assertion, he addressed the use, or lack of use, of other investigative techniques.  With regard to minimization, he represented that the Government would minimize conversations of a non-criminal nature, although spot monitoring would occur.

On March 10, 2009, United States District Judge William R. Wilson, Jr., authorized the wiretap of Gaines' cell phone.  The order authorizing the wiretap largely conformed to the representations contained in Hays' affidavit.  Judge Wilson specifically found, <u>inter alia</u>, that there was probable cause to believe that Thompson and Gaines were among the individuals engaged in the subject offenses identified in Hays' affidavit; that Gaines' cell phone, identified as the "target telephone," was being used in connection with the commission of the subject offenses; and that normal investigative techniques either failed, appeared unlikely to succeed, or were too dangerous.  Judge Wilson also ordered that conversations of a non-criminal nature be minimized, the specifics of that provision being substantially similar to the specifics as to minimization ordered by Judge Miller.

On March 23, 2009, and again on April 6, 2009,  the Government filed separate ten day progress reports.  They provided a summary of the evidence obtained by means of the Gaines wiretap.

<u>SECOND GAINES WIRETAP</u>.  The first Gaines wiretap expired after thirty days, and the Government returned to Judge Wilson seeking a second wiretap of Gaines' cell phone.  The application was supported by an affidavit from Hays. His second affidavit was substantially similar to his first affidavit as to his belief that Gaines' cell phone was being used in connection with the commission of the subject offenses, as to the probable cause for the wiretaps, as to the necessity of the wiretaps and the failure of other

investigative techniques, and as to the steps the Government would take to minimize all conversations of a non-criminal nature.  His second affidavit was not, however, identical to his first affidavit as his second affidavit contained additional representations built upon evidence acquired by means of the earlier wiretaps.

On April 13, 2009, Judge Wilson authorized the second wiretap of Gaines' cell phone.  The order authorizing the wiretap largely conformed to the representations contained in Hays' affidavit.  Judge Wilson specifically found, <u>inter alia</u>, that there was probable cause to believe that Thompson and Gaines were among the individuals engaged in the subject offenses identified in Hays' affidavit; that Gaines' cell phone was being used in connection with the commission of the subject offenses; and that normal investigative techniques either failed, appeared unlikely to succeed, or were too dangerous.  Judge Wilson also ordered that conversations of a non-criminal nature be minimized, the provision being substantially similar to the provision as to minimization in his first order.

On April 23, 2009, and again on May 4, 2009, the Government filed separate ten day progress reports.  They provided a summary of the evidence obtained by means of the second Gaines wiretap.

<u>THIRD GAINES WIRETAP</u>.  The second Gaines wiretap expired after thirty days, and the Government returned to Judge Wilson seeking a third wiretap of Gaines' cell phone. The application was supported by an affidavit from FBI Special Agent Carrie Land

("Land").  A summary of her affidavit will not be attempted; instead, the undersigned simply makes note of several of her representations.  She named Thompson and Gaines as among the interceptees and violators but did not name Thompson's son, Baggett, or Deleo.  She identified the subject offenses as mail fraud, wire fraud, bribery of a public official, and conspiracy to commit those offenses.  Land set forth the probable cause to support the wiretap, facts that were derived from several sources.  With regard to the necessity of the wiretap, she represented that it was the only available investigative technique that had a reasonable likelihood of securing the necessary evidence and, in support of that assertion, she addressed the use, or lack of use, of other investigative techniques.  With regard to minimization, she represented that the Government would minimize conversations of a non-criminal nature, although spot monitoring would occur.

On May 13, 2009, Judge Wilson authorized the third wiretap of Gaines' cell phone. The order authorizing the wiretap largely conformed to the representations contained in Land's affidavit.  Judge Wilson specifically found, <u>inter alia</u>, that there was probable cause to believe that Thompson and Gaines were among the individuals engaged in the subject offenses identified in Lands' affidavit; that Gaines' cell phone was being used in connection with the commission of the subject offenses; and that normal investigative techniques either failed, appeared unlikely to succeed, or were too dangerous.  Judge Wilson also ordered that conversations of a non-criminal nature be minimized, the provision being substantially similar to the provision as to minimization in his first order.

On May 28, 2009, and again on June 2, 2009, the Government filed separate ten day progress reports. They provided a summary of the evidence obtained by means of the third Gaines wiretap.

MASSACHUSETTS WIRETAP. During the midst of the aforementioned investigation, the Government sought and obtained a wiretap in Massachusetts on a cell phone apparently subscribed to by Deleo. The orders authorizing the wiretap and its re-authorizations provided, inter alia, that there was probable cause to believe that Thompson and Deleo were involved in criminal misconduct in Massachusetts.

THE INDICTMENTS. Thompson, Gaines, and Baggett were indicted in 4:09CR00265; Thompson and Deleo were indicted in 4:09CR00305; and George Allen Thompson was indicted in 4:10CR00094. The defendants have now filed separate motions to suppress. For the sake of clarity, the undersigned will address each defendant and his reasons for suppression separately, making mention first of an issue that was addressed prior to the hearing on their motions.

BURDEN. At the outset, the undersigned notes that the defendants carry the initial burden. In that regard, the Court of Appeals noted in United States v. Phillips, 540 F.2d 319, 325 (8th Cir. 1976), that "(t)he burden is … on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed." See also United States v. Garcia, 785 F.2d 214 (8th Cir. 1986). This burden should be distinguished from the burden to prove taint flowing from an illegality.

"(W)hen an illegal search has come to light, (the government) has the ultimate burden of persuasion to show that its evidence is untainted."  See United State v. Phillips, 540 F.2d at 326 (internal quotations omitted).

THE FRANKS ISSUE.  Thompson maintains that he is entitled to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), on the question of whether Spurgers' representations as to the criminal backgrounds of Cooperating Witness 1 ("CW1") and Cooperating Witness 2 ("CW2") were deliberately false, suggested a reckless disregard of the truth, or omitted facts clearly critical to the authorizing judge's finding of probable cause.  In order to provide some guidance to the parties, the undersigned elected to address Thompson's assertion prior to the hearing.  The undersigned found that Spurgers' affidavit did not omit facts touching on the criminal backgrounds of CW1 and CW2.[2]  Although additional information might have been helpful, the facts that were

---

[2]

The undersigned specifically found the following:

"With regard to whether Spurgers omitted any facts in his affidavit touching on the criminal background of CW1, Spurgers' affidavit reflects the following: (1) CW1 had previously served as a law enforcement officer but had resigned when he was charged with theft by an ex-girlfriend, (2) the charge was ultimately dismissed, and (3) he is currently on probation after being convicted of nonpayment of checks in connection with a failed business effort.  Thompson faults Spurgers for failing to make note of CW1's habitual passing of insufficient checks in the late 1990s, which resulted in a reprimand, caution, and eventual suspension by his employer.  The undersigned fails to see how habitually passing insufficient checks, misconduct that did not result in a criminal charge, is particularly germane to an adequate understanding of CW1's criminal background and should have been noted by Spurgers in the affidavit.  The undersigned is not aware of any obligation on the part of an affiant to note all non-criminal misconduct by a cooperating witness, and Thompson has not cited any such obligation.

"Thompson faults Spurgers for omitting the fact that CW1 was actually charged with felony theft of property.  The undersigned fails to see how the true class of the offense is particularly germane to an adequate understanding of CW1's criminal background and should have been noted by Spurgers in the

provided were adequate to apprise the authorizing judge of their criminal backgrounds. Alternatively, the undersigned found that Spurgers did not omit facts in reckless disregard of the truth, thereby making his affidavit misleading.[3]   Thus, the undersigned found, and again finds, that the defendants were not entitled to a <u>Franks</u> hearing.

---

affidavit.  He noted that CW1 had been charged with theft but that the charge had been ultimately dismissed, which the undersigned finds was adequate to apprise the authorizing judge of the charge and its eventual disposition.

"Thompson also faults Spurgers for omitting the particulars of the offense and punishment for which CW1 is currently on probation.  Although the inclusion of that information in Spurgers' affidavit might have been helpful, the undersigned fails to see how the particulars of the offense and punishment are germane to an adequate understanding of CW1's criminal background and should have been noted by Spurgers in the affidavit.  He noted that CW1 was convicted of nonpayment of checks and is currently on probation, which the undersigned finds was adequate to apprise the authorizing judge of the offense and punishment.

"With regard to whether Spurgers omitted any facts in his affidavit touching on the criminal background of CW2, Spurgers' affidavit reflects the following: (1) CW2 has previously been convicted of illegal drug offenses, and (2) he agreed to cooperate with the FBI in exchange for not being charged with an offense that would result in his/her imprisonment.  Thompson faults Spurgers for failing to make note of the specifics of CW2's three drug convictions, specifically, the exact nature of the offenses and the resulting punishments.  Although the inclusion of that information in Spurgers' affidavit might have been helpful, the undersigned fails to see how the particulars of CW2's three convictions and resulting punishments are germane to an adequate understanding of CW2's criminal background and should have been noted by Spurgers in the affidavit.  He noted that CW2 had been convicted of several drug offenses, which the undersigned finds was adequate to apprise the authorizing judge of CW2's criminal background."

<u>See</u> 4:09CR00265, Document 125 at 8-10.

[3]

The undersigned specifically found the following:

"… [Thompson] has failed to show … that the omitted information was "'clearly critical' such that had it been included, the affidavit would not have supported a finding of probable cause." [Citation omitted].  Spurgers specifically noted that both informants had criminal backgrounds and provided a general outline of those backgrounds, <u>i.e.</u>, charges, convictions, and punishment.  Although the inclusion of the omitted information in Spurgers' affidavit might have been helpful, the undersigned does not see how it would have added much to the authorizing judge's ability to assess their credibility.

<u>See</u> 4:09CR00265, Document 125 at 11.

THOMPSON.  In turning to Thompson's remaining assertions, the undersigned notes that he has filed two motions: the first in 4:09CR00265 and the second in 4:09CR00305. In the motion filed in 4:09CR00265, he advances seven reasons for suppressing the evidence obtained by means of the wiretaps.  He first maintains that for the following reasons, the Government failed to show probable cause for the first Thompson wiretap: (1) there was no showing that he was engaging in an illegal gambling business involving five or more people as required by 18 U.S.C. 1955(b)(ii); (2) there was no showing that he was using his cell phone to conduct an illegal gambling business; (3) "[n]either informant had been used before and, therefore, neither had a track record of providing reliable information," see 4:09CR00265, Document 82 at 14; and (4) "[t]he information supplied by the two informants was not independently corroborated," see Id.

Probable cause for the issuance of a wiretap is evaluated under the same standard as probable cause for the issuance of a search warrant.  See United States v. Fairchild, 189 F.3d 769 (8th Cir. 1999).  Specifically, "probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime."  See Id. at 775 [citing Illinois v. Gates, 462 U.S. 213 (1983)].  It requires a "commonsense analysis of the facts available to the judicial officer who issued the warrant," and "great deference" is accorded to the judicial officer's "initial, on-the-scene determination that probable cause has been established."  See United States v. Colbert, 605 F.3d 573, 576 (2010).

Thompson maintains that there was no showing that he was engaging in an illegal gambling business involving five or more people.  He maintains that Spurgers identified six participants in the gambling business, <u>i.e.</u>, Thompson, Dana K. Kuykendall, Robert J. Clay, Tony L. Milner, Gene P. Baker, Jr. ("Baker), and George Allen Thompson, but that the roles of Baker and George Allen Thompson were actually unknown to Spurgers at the time he signed his first affidavit.

It is true that Spurgers acknowledged in his first affidavit that Baker's precise role in the business was "undefined" and that George Allen Thompson's precise role in the business was "unknown."   <u>See</u>  4:09CR00265,  Document  105,  Volume  1, Applications/Order Tab, December 2, 2008, Affidavit of Gerald Spurgers at 11.  Given the representations made by Spurgers in his affidavit, though, an authorizing judge could find that there was a fair probability that Baker and George Allen Thompson had some role in the business.  With regard to Baker, surveillance suggested that he was involved to some degree with the collection and/or payment of bets, <u>see</u> <u>Id</u>. at 40-41, and that he sometimes met with the other participants in the business at a local restaurant to exchange envelopes and/or slips of paper, what Spurgers represented to be a reconciliation process.  <u>See</u> <u>Id</u>. at 30, 33, 35, 37, 40-42.  In addition, telephone record analysis and pen register analysis indicated that a cell phone subscribed to Baker and a cell phone subscribed to his wife made frequent calls to Thompson's cell phone and the cell phones of other participants in the business.  <u>See</u> <u>Id</u>. at 44-45, 48.

With regard to George Allen Thompson, CW1 advised law enforcement agents that George Allen Thompson was a participant in the business.  See Id. at 19.  Telephone toll records and pen register analysis indicated that a cell phone subscribed to George Allen Thompson made calls to Thompson's cell phone, the cell phone of another participant in the business, and the cell phone of a suspected bettor.  See Id. at 45-46, 48.

Thompson next maintains that there was no showing that he was using his cell phone to conduct an illegal gambling business.  He maintains that Spurgers' affidavit was built upon the premise that CW1 observed Thompson using his cell phone to conduct gambling business but that the "target telephone" identified in Spurgers' first affidavit was not acquired by Thompson until after CW1 stopped working for Thompson.

Accepting the truth of Thompson's assertion that CW1 stopped working for Thompson before he acquired the "target telephone," an authorizing judge could find that there was a fair probability that Thompson was using the "target telephone" to conduct the business.  Surveillance indicated that he regularly used what was believed to be the "target telephone" to contact suspected bettors shortly before meeting them, see Id. at 25-29, 34-39, and he received calls relating to legal gambling from CW1 and CW2 on the "target telephone," see Id. at 21-22, 23-25.  In addition, the Government is likely correct in that "the sheer volume of calls to and from [the target telephone] as reflected in pen register data … supported the conclusion that [he] was conducting a gambling operation through his cell phone."  See 4:09CR00265, Document 117 at 12.

Thompson next challenges the credibility of CW1 and CW2.  Thompson maintains that neither CW1 nor CW2 had ever before been used as an informant and therefore neither cooperating witness had a track record of providing reliable information, and alternatively, the information they provided was not independently corroborated.

It appears to be undisputed that neither CW1 nor CW2 had ever before been used as an informant and, therefore, neither had a track record of providing reliable information to law enforcement agents.  That fact does not, however, render CW1 and CW2's information unreliable as some of the information they provided was independently corroborated.[4]  Admittedly, CW1 was a former police officer who was on probation for a criminal offense and who had initially provided false information to law enforcement agents.  Nevertheless, some of the information he subsequently provided was partially corroborated by the following sources: (1) the surveillance of Thompson and other participants in the gambling business, see 4:09CR00265, Document 105, Volume 1, Applications/Order Tab, December 2, 2008, Affidavit of Gerald Spurgers at 29-30, 33-34, 40; (2) by testing CW1's ability to identify some of the participants in the business and/or suspected bettors, see Id. at 18, 27; and (3) by telephone toll records and monitoring telephone calls between CW1 and Thompson, see Id. at 21-22.

---

[4]

"An informant's tip can be sufficient to establish probable cause if the informant has a track record of supplying reliable information or if the tip is corroborated by independent evidence." See United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002) [internal quotations omitted].  See also United States v. Humphreys, 982 F.2d 254 (8th Cir. 1992) [when information is at least partly corroborated, attacks upon credibility and reliability not crucial to finding of probable cause].

CW2 also had a criminal background, and Spurgers himself noted that CW2 was of "questionable reliability." See Id. at 56.  Some of the information he provided, though, was partially corroborated by the following sources: (1) the surveillance of Thompson and other participants in the business, see Id. at 30-31, 35, 40; (2) by testing CW2's ability to identify some of the participants in the business and/or suspected bettors, see Id. at 30; and (3) by telephone toll records and monitoring telephone calls between CW2 and Thompson, see Id. at 23-25.

Thompson next maintains that Spurgers' first affidavit failed to satisfy the necessity requirement codified in 18 U.S.C. 2518.  Thompson maintains that the requirement was not satisfied because the affidavit did not establish that less intrusive investigative techniques were tried and failed, were likely to fail, or were too dangerous to employ.

18 U.S.C. 2518(1)(c) provides that an application for an order authorizing a wiretap shall include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  A judge may authorize the wiretap if he determines on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  See 18 U.S.C. 2518(3)(c).  With regard to the necessity requirement, the Court of Appeals has noted the following:

... Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation, [citation omitted], and " * * * to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." [Citation omitted]. The government's showing must, of course, be tested in a "practical and commonsense fashion." [Citations omitted]. And as in other suppression matters, considerable discretion rests with the judge to whom the wiretap application is made. [Citation omitted].

See United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976).

Thompson faults Spurgers for failing to adequately explain why undercover agents were not used. Thompson maintains that there was no attempt to use undercover agents as bettors, a natural avenue of investigation into any alleged illegal gambling business. A portion of Spurgers' explanation for not using undercover agents–illegal gambling businesses are oftentimes difficult to penetrate–appears conclusory, which was condemned in United States v. Spagnuolo, 549 F.2d 705 (9th Cir. 1977) (Title III does not support position that all gambling conspiracy are tough to crack and Government need only show probability that illegal gambling afoot). His explanation is not defective, though, because he offered additional information, which is plausible under the circumstances. He represented that the likely means for introducing an undercover agent into the gambling business would have been by means of CW1 and CW2 but that they could no longer vouch for an undercover agent's legitimacy as a bettor as CW1 was no longer associated with the business and CW2's loyalty was questionable.

-22-

Thompson faults Spurgers for failing to adequately explain why confidential sources were not fully developed.  With regard to CW1 and CW2, Spurgers offered an adequate explanation for why they were no longer used as informants.  See 4:09CR00265, Document 105, Volume 1, Applications/Order Tab, December 2, 2008, Affidavit of Gerald Spurgers at 55-56.[5]  With regard to other informants, Thompson maintains that the Government could have developed any number of informants but did not. The undersigned has no idea whether the Government attempted to recruit informants other than CW1 and CW2.  Without deciding whether such an effort should have been attempted, the undersigned fails to see how the Government was obligated to pursue additional informants.

Thompson also faults Spurgers for failing to adequately explain why physical surveillance, toll and pen register records, and trash covers or pulls were ineffective. He supports his assertion by citing United States v. Blackmon, 273 F.3d 1204 (8th Cir. 2001), and United States v. Kalustian, 529 F.2d 585 (8th Cir. 1976), cases that stand for the proposition that the Government must offer something more than mere conclusions.

---

[5]

Spurgers represented that CW1 was no longer used as an informant for the following reasons: (1) he stopped working for Thompson when asked to transport what CW1 believed to be marijuana, (2) Thompson believed that CW1 still owed Thompson money, and (3) CW1 no longer lived in central Arkansas and was not in a position to gain information about Thompson's activities.

Spurgers represented that CW2 was no longer used as an informant for the following reasons: (1) he was of questionable loyalty, given that he had told Thompson about meeting with FBI agents; and (2) CW2 had expressed increasing reluctance to cooperate with law enforcement agents.

Although portions of Spurgers' explanations as to why those investigative techniques were ineffective appear conclusory, the explanations were not defective as they contained additional information.   Physical surveillance was tried and produced information as to the collection and distribution of envelopes and/or slips of paper slips and frequent meetings.  <u>See</u> 4:09CR00265, Document 105, Volume 1, Applications/Order Tab, December 2, 2008, Affidavit of Gerald Spurgers at 51-53.   Toll and pen register records were compiled and produced an extensive catalog of calls between the participants in the business and suspected bettors.  <u>See Id</u>. at 54.   Additionally, a trash pull was attempted at Thompson's residence but produced very little.  <u>See Id</u>. at 59-60.

With the expectation that Spurgers' first affidavit would be found defective, Thompson next maintains that the evidence obtained by means of the second and third Thompson wiretaps should be suppressed.   He maintains that the evidence obtained by means of the subsequent wiretaps is the "fruit of a poisonous tree."   The undersigned cannot agree.   He has failed to show that Spurgers' first affidavit was defective; for that reason, evidence obtained by means of the second and third Thompson wiretaps is not the "fruit of a poisonous tree."

Thompson next maintains that Spurgers' second and third affidavits were defective because they simply parroted the first affidavit signed by Spurgers.   Typically, each affidavit must stand on its own and cannot simply rest upon the representations contained in an earlier affidavit.  <u>United States v. Garcia-Villalba</u>, 585 F.3d 1223 (9th Cir.

2009), provides, however, that historical facts from previous applications, particularly those within the same investigation, will almost always be relevant.  Setting aside the Government's assertion that the second and third affidavits were "straight up renewals or re-ups of the pending wire," see 4:09CR00265, Document 117 at 18, the undersigned is satisfied that Spurgers' second and third affidavits can stand on their own.  Although the affidavits were similar to his first affidavit with regard to many of his representations, the second and third affidavits did contain additional representations.

Thompson next maintains in a conclusory fashion that Spurgers' second and third affidavits failed to satisfy the necessity requirement.  He maintains that they failed to satisfy the requirement because they did not establish that less intrusive investigative techniques were tried and failed, or were likely to fail, with regard to the later identified subject offenses.  The Government's showing of necessity must be tested in a practical and commonsense fashion.  Here, an investigation into an alleged illegal gambling business uncovered extensive evidence of other criminal activity.  Given what appears to have been a complex and evolving conspiracy, it is difficult to see how the Government can be faulted for not fully utilizing other investigative techniques as to the later identified subject offenses.  Other techniques were being employed, such as pen registers and surveillance, and there has been no showing how a cooperating witness could have been developed to penetrate the conspiracy surrounding Thompson's cocaine and illegal firearm activities without jeopardizing the overall investigation.

With the expectation that the Spurgers' first affidavit would be found defective, Thompson next maintains that the evidence obtained by means of the three Gaines wiretaps should be suppressed.   Thompson maintains that the evidence obtained by means of the three Gaines wiretaps is the "fruit of a poisonous tree."   The undersigned cannot agree.   Thompson has failed to show that Spurgers' first affidavit was defective; for that reason, evidence obtained by means of the three Gaines wiretaps is not the "fruit of a poisonous tree."

Thompson last maintains in a conclusory fashion that Hays and Land's affidavits failed to satisfy the necessity requirement.   Thompson maintains that they failed to satisfy the requirement because they did not establish that less intrusive investigative techniques were tried and failed or were likely to fail.   The undersigned has reviewed the three affidavits and finds that the requirement has been satisfied.   As the undersigned noted above, an investigation into an alleged illegal gambling business uncovered extensive evidence of other criminal activity.   Given what appears to have been a complex and evolving conspiracy, it is difficult to see how the Government can be faulted for not fully utilizing other investigative techniques as to the subject offenses identified in Hays and Land's affidavits.   Other techniques were being employed, such as pen registers and surveillance, and there has been no showing how a cooperating witness could have been developed to penetrate the dealings involving Thompson, Gaines, and Mayfield without jeopardizing the overall investigation.

Thompson has also filed a motion to suppress in 4:09CR00305.  In that case, he advances roughly the same reasons for suppression as he does in 4:09CR00265, save the following two reasons.  With the expectation that the Spurgers' first affidavit would be found defective, Thompson maintains that the evidence obtained by means of the Massachusetts wiretap and its re-authorizations should be suppressed.  He maintains that the evidence is the "fruit of a poisonous tree."  The undersigned cannot agree.  He has failed to show that Spurgers' first affidavit was defective; for that reason, evidence obtained by means of the Massachusetts wiretap and its re-authorizations is not the "fruit of a poisonous tree."

Thompson also maintains in a conclusory fashion that the affidavits offered in support of the Massachusetts wiretap and its re-authorizations failed to satisfy the necessity requirement.  The undersigned has reviewed the affidavits and finds that the requirement has been satisfied.  Here, an investigation into an alleged illegal gambling business uncovered extensive evidence of other criminal activity.  Given what appears to have been a complex and evolving conspiracy, it is difficult to see how the Government can be faulted for not fully utilizing other investigative techniques as to the subject offenses identified in the Massachusetts wiretap.  Other techniques were being employed, such as pen registers and surveillance, and there has been no showing how a cooperating witness could have been developed to penetrate Thompson and Deleo's cocaine distribution operation without jeopardizing the overall investigation.

-27-

GAINES.  Gaines has also filed a motion to suppress in 4:09CR00265.  He advances

three reasons for suppressing the evidence obtained by means of the wiretaps.  He first

maintains that the Government failed to obtain judicial approval to intercept

communications that were outside the scope of the Thompson wiretaps as required by

18 U.S.C. 2517(5).[6]

From time to time, a wiretap will uncover evidence of criminal activity outside

the scope of the initial authorization.   Those situations are governed by 18 U.S.C.

2517(5), which provides, in part, the following:

> When an investigative or law enforcement officer, which engaged
> in intercepting … communications in the manner authorized herein,
> intercepts … communications relating to offenses other than those
> specified in the order of authorization or approval, the contents thereof,
> and evidence derived therefrom, may be disclosed or used as provided in
> subsections (1) and (2) of this section.  Such contents and any evidence
> derived therefrom may be used under subsection (3) of this section when
> authorized or approved by a judge of competent jurisdiction where such
> judge finds on subsequent application that the contents were otherwise
> intercepted in accordance with the provisions of this chapter.  …  Such
> application shall be made as soon as practicable.

---

[6]

Gaines maintains in his submissions, and in examining Land during the hearing, that the
Government had multiple opportunities to seek judicial approval for adding alleged criminal conduct
involving him to the scope of the Thompson wiretaps, but the Government failed to do so as soon as
practicable as required by 18 U.S.C. 2517(5).  Gaines maintains that instead, the Government used the
Thompson wiretaps, and specifically, a single wager on a football game allegedly made by Gaines, as a
pretext for listening to his telephone conversations, thereby obtaining incriminating evidence against him
that resulted in his indictment.  In examining Land during the hearing, Gaines also attempted to establish
the proposition that he was subjected to a degree of scrutiny that the other four defendants were not,
primarily because he was a member of the North Little Rock, Arkansas, City Council and therefore a public
official.

On December 24, 2008, the Government filed its second ten day progress report in connection with the first Thompson wiretap.  A "linesheet" accompanying the report reflects that on December 20, 2008, a caller, "possibly Cary Gaines," placed a wager on a football game.  See 4:09CR00265, Document 105, Volume 1, Second Progress Report Tab, Call No. 1173, page 156 of 244.  A second "linesheet" reflects that on December 22, 2008, Thompson told a "Terry Gaines" that "[w]e need contracts that you do not have to bid on from the city involving concrete work, sidewalk work, stuff like that.  I've got a man that would fit the bill.  The guy['s] name is Paul Mayfield."  See Id. at Call No. 1332, page 211 of 244.

After the aforementioned report was submitted, a conversation occurred between Thompson and Paul Mayfield ("Mayfield") in which they discussed Mayfield's attempt to obtain a contracting license and Gaines could be heard in the conversation.  It was interpreted to suggest that Thompson was a middleman for Gaines and Mayfield.

When the Government returned to Judge Miller seeking a second wiretap, and a third wiretap, of Thompson's cell phone, the Government identified Gaines as among those believed to be engaging in the subject offenses.  As he correctly notes, however, the subject offenses listed in Judge Miller's orders authorizing the second and third Thompson wiretaps never made mention of, among other offenses, bribery of a public official.  Instead, the subject offenses listed in those orders included, among other offenses, gambling, money laundering, illegal firearms, and the distribution of cocaine.

On February 13, 2009, the Government filed its first ten day progress report in connection with the third Thompson wiretap. One of the "linesheets" submitted with the report reflects a February 10, 2009, conversation between Thompson and Deleo, a reputed member of a New England crime family and with whom Thompson was allegedly trafficking cocaine.  Thompson represented that he had "two people on the council now in North Little Rock."  See 4:09CR00265, Document 105, Volume 3, First Progress Report Tab, Call No. 4357, page 247 of 326.  Although Thompson did not specifically identify anyone by name, Gaines was known to be at that time a member of the North Little Rock, Arkansas, City Council.

After the submission of the second ten day progress report in connection with the third Thompson wiretap, the Government represents that the following occurred:

> On March 3, 2009, Gaines called Thompson to ask where they were on their deal.  Later that same day, Gaines called Thompson and stated, "George, I got to do this with you.  I got to get everything caught up."  Gaines called Thompson again that day and asked for more money to finish his divorce.

See 4:09CR00265, Document 71 at 5.

On March 10, 2009, the Government sought the first Gaines' wiretap.  Hays represented in his affidavit in support of the wiretap that the communications expected to be intercepted included offenses relating to bribery of a public official.

The undersigned has no difficulty in finding that the Government properly intercepted Gaines' December 20, 2008, call to Thompson's cell phone.  In that call, Gaines called to place a wager on a football game.  Having done so, he placed himself "on law enforcement's radar screen."  See Id. at 11.  The Government could thereafter reasonably suspect that a call from Gaines might be related to Thompson's gambling business and could therefore properly intercept the call.  Gaines has failed to show that the subsequent interception of his calls, including calls suggesting a scheme to structure municipal contracts so as to avoid a bidding requirement, was motivated by some illicit purpose.  See United States v. London, 66 F.3d 1227 (1st Cir. 1995) (interception unlawful if motivated by illicit purpose).  The question is whether the Government acted as soon as practicable in seeking judicial authorization to expand the scope of the interceptions.

As noted, 18 U.S.C. 2517(5) requires the Government to seek judicial authorization to expand the scope of its interceptions "as soon as practicable."  The authority cited by the parties indicates that the phrase has no precise definition.  At a minimum, it does not mean "immediately."  See United States v. Arnold, 773 F.2d 823 (8th Cir. 1985).  Instead, the term appears to be construed flexibly and in a commonsensical fashion.  See United States v. Levine, 690 F.Supp. 1165 (E.D.N.Y. 1988).

On December 22, 2008, the Government intercepted a call from Gaines to Thompson that the Government suspected might involve an effort by them to structure municipal contracts so as to avoid a bidding requirement.  It was not until Hays' first

affidavit on March 10, 2009, that the Government sought judicial authorization to intercept calls to and from Gaines' cell phone relating to that matter.   Thus, the Government waited roughly two and one-half months to seek judicial authorization.  Is that as soon as practicable?   Given the facts and circumstances noted by the Government, the undersigned is satisfied that the Government acted as soon as practicable.  The undersigned can believe that before seeking judicial authorization, the Government was under some obligation to investigate the contracting procedures and city ordinances of the City of North Little Rock, Arkansas; the finances of Gaines and Thompson; and Mayfield's possible role.  Gaines has failed to show that the interception of his calls between December 22, 2008, and March 10, 2009, was a subterfuge for listening to his calls for which the Government had no probable cause.

Gaines next maintains, and argued extensively during the hearing, that the Government failed to appropriately minimize the calls made to Thompson's cell phone and the calls made to and from Gaines' cell phone.  He maintains that the Government listened to hours of his private conversations when only a small percentage of his conversations were remotely related to the criminal offense he is primarily charged with in the third superseding indictment, that being, conspiracy to commit wire fraud.

18 U.S.C. 2518(5) provides, in part, that "[e]very order and extension thereof shall contain a provision that the authorization to intercept … shall be conducted in such a way as to minimize the interception of communications not otherwise subject to the

interception under this chapter ..."  In <u>United States v. Garcia</u>, 785 F.2 at 224, the Court

of Appeals stated the following with regard to minimization:

> The standard is one of reasonableness, and each case must be examined on
> its particular facts; "there can be no inflexible rule of law which will
> decide every case."  [Citation omitted].  The factors to be considered
> include the scope of the criminal enterprise, the government's reasonable
> expectation of the content of particular calls, the extent of judicial
> supervision, the length of the call, whether the call was a one-time only
> call, whether the call originated from a pay or a residential telephone, and
> whether the callers used ambiguous or coded language.

<u>United States v. West</u>, 589 F.3d 936, 939 (8th Cir. 2009), provides that the relevant

question is whether the actions of law enforcement agents were "objectively reasonable

in light of the particular circumstances."

In Gaines' motion, he faults the Government for failing to minimize two December

22, 2008, calls, the first he had with Thompson and the second Thompson had with

Mayfield.   In the first conversation, Thompson appeared to speak of his desire to

structure municipal contracts so as to avoid a bidding requirement.   In the second

conversation, Thompson and Mayfield discussed the latter's attempt to become a

licensed contractor.[7]

---

[7]

The undersigned acknowledges some confusion as to when this conversation actually occurred.  In
the first pages of the Government's response, it appears that the conversation occurred on December 24,
2008.  <u>See</u> 4:09CR00265, Document 71 at 4 (Thompson-Gaines conversation occurred on December 22,
2008, and Thompson-Mayfield conversation occurred "two days later.")  In the latter pages of the
Government's response, it appears that the conversation occurred on December 22, 2008.

If the two conversations are viewed in isolation, Gaines' position might have some appeal.  The conversations cannot, however, be viewed in isolation; they must instead be viewed in the context of other conversations and the information possessed by law enforcement agents.  As the undersigned has noted, Gaines placed himself on "law enforcement's radar screen" when he placed a wager with Thompson on December 20, 2008.  The Government could thereafter reasonably suspect that a call from Gaines might be related to Thompson's gambling business, particularly since the Government did not know the full scope of his business or who might simply be a bettor and who might have a larger role in the business.  Mayfield's name first came to the attention of law enforcement agents when Thompson told Gaines that Mayfield would "fit the bill" for their enterprise.

With regard to the Thompson-Gaines conversation on December 22, 2008, it is undisputed that they initially discussed matters of a non-criminal nature.  The Government nevertheless represents, and Gaines has not rebutted, that mention of municipal contracts arose within approximately the first minute of the conversation. With regard to the Thompson-Mayfield conversation of the same day, Gaines has failed to show if and when matters of a non-criminal nature were discussed or at what point in the conversation Thompson and Mayfield began discussing their enterprise.  The actions of the law enforcement agents in monitoring the conversations were not objectively unreasonable in light of the particular circumstances.

Gaines also faults the Government for failing to minimize calls between Thompson and Mayfield on December 24, 2008, and on December 30, 2008. The conversations must be viewed in the context of other conversations and the information possessed by law enforcement agents. They could reasonably suspect that a conversation between Thompson and Mayfield might be related to the illegal structuring of municipal contracts, and the interception of the calls was permitted. With regard to the conversations, Gaines has failed to show if and when matters of a non-criminal nature were discussed or at what point in the conversation Thompson and Mayfield began discussing matters of an illegal nature. The actions of the law enforcement agents in monitoring the conversations were not objectively unreasonable in light of the particular circumstances.

Gaines also faults the Government for the number of calls it monitored. The orders authorizing the Thompson and Gaines wiretaps required law enforcement agents to minimize intercepted calls. In addition, law enforcement agents were aware of the minimization requirement and had been trained in its execution. See 4:09CR00305, Document 80 at 3-4. Assuming that they minimized only a small number of Gaines' calls, that fact alone does not establish that they acted unreasonably. See United States v. West, supra. (fact that small number of calls minimized does not establish agents acted unreasonably).[8] Instead, all of the relevant circumstances must be considered.

---

[8] The Government submitted two exhibits during the hearing that provided a breakdown of the total number of calls, and the total number of calls minimized, on the Thompson wiretaps and the Gaines wiretaps. The unrebutted exhibits establish that more than a small number of the calls were minimized.

Law enforcement agents began by wiretapping a cell phone subscribed to Thompson, a primary figure in an illegal gambling business which involved several other individuals.   He was known to use his cell phone in conducting the business, both in conversing with the individuals who were involved with him in the business and in conversing with suspected bettors.   During the course of the Government's investigation into the business, evidence of other criminal conduct came to light, evidence that the Government legitimately acquired and that, among things, implicated Gaines in what appeared to be a scheme to structure municipal contracts so as to avoid a bidding requirement.   Law enforcement agents were therefore likely to intercept a multitude of calls pertaining to the many different types of criminal conduct, calls which came largely from the same people.   Gaines has failed to adequately demonstrate that the calls that should have been minimized were not.

With the expectation that the Thompson wiretaps would be found defective, Gaines next maintains that the evidence obtained by means of the Gaines wiretaps should be suppressed.   He maintains that the evidence obtained by means of the Gaines wiretaps is the "fruit of a poisonous tree."   The undersigned cannot agree.   Gaines has failed to show that the Thompson wiretaps were defective; for that reason, evidence obtained by means of the three Gaines wiretaps is not the "fruit of a poisonous tree."

BAGGETT.   Baggett has also filed a motion to suppress in 4:09CR00265.   "So as to not clog the file with unnecessary pages to read," see 4:09CR00265, Document 118 at 1,

he incorporates the reasons for suppression advanced by Thompson and Gaines in 4:09CR00265 and Thompson and Deleo in 4:09CR00305.  In addition to adopting the reasons for suppression advanced by those defendants, Baggett advances three reasons for suppressing the evidence obtained by means of the wiretaps.  He first maintains that no probable cause was shown specifically as to him in Spurgers' second affidavit, the first time his name appeared in any affidavit, and the affidavit was therefore insufficient on its face.

On December 15, 2008, the Government filed its first ten day progress report in connection with the first Thompson wiretap.  One of the "linesheets" submitted with the report reflects that on December 5, 2008, Thompson, a convicted felon, sought Baggett's assistance in obtaining a firearm and/or ammunition.  See 4:09CR00265, Document 105, Volume 1, First Progress Report Tab, Call No. 82, page 33 of 240.  It was apparently on the basis of that conversation that Baggett was identified as an interceptee and violator in Spurgers' second affidavit.  It is true that Baggett's name was not mentioned at any other point in the affidavit, but that fact does not cause the affidavit to be defective.

The Government maintains that Spurgers was under no obligation to "describe each interceptee or otherwise establish probable cause for each interceptee."  See 4:09CR00265, Document 121 at 8.  The undersigned knows of no authority to the contrary, and Baggett has not cited any.  Instead, the Government maintains that it was only required to show probable cause for believing that the subject offenses were being

committed and the identity of those expected to be intercepted.  The Government's assertion appears consistent with the language of 18 U.S.C. 2518(1)(b).  The undersigned is satisfied that the Government showed probable cause to believe that a second wiretap of Thompson's cell phone would disclose evidence of illegal firearms activity and that Baggett could reasonably be expected to be involved in a conversation with Thompson on his cell phone regarding that activity.

Baggett next maintains that the lack of probable cause violated the neutral and detached magistrate requirement.  The undersigned confesses some difficulty in fully understanding his assertion.  To the extent he questions the neutrality and detachment of the authorizing judges, the undersigned finds that he has failed to offer specific examples or citations to the record in support of his assertion.

Baggett last maintains in a conclusory fashion that Spurgers' second affidavit failed to satisfy the necessity requirement as to Baggett.  As the undersigned noted above, an investigation into an alleged illegal gambling business uncovered extensive evidence of other criminal activity.  Given what appears to have been a complex and evolving conspiracy, it is difficult to see how the Government can be faulted for not fully utilizing other investigative techniques as to Baggett.  Other techniques were being employed, such as pen registers and surveillance, and there has been no showing how a cooperating witness could have been developed to penetrate the apparent illegal activities involving Thompson and Baggett without jeopardizing the overall investigation.

DELEO.  Deleo has filed a motion to suppress in 4:09CR00305.  He advances two reasons for suppressing the evidence obtained by means of the wiretaps.  He first maintains that Spurgers' first affidavit failed to satisfy the necessity requirement codified in 18 U.S.C. 2518.  Deleo's assertion of necessity differs from the assertions of necessity made by the other defendants; he maintains the following:

> … the evidence gained by the traditional investigative methods used in this investigation was enough to charge and possibly convict … Thompson for the Target Offenses of conducting a gambling business, conspiracy to conduct a gambling business, and money laundering.  The traditional method[s] succeeded, but to drive the death nail in the coffin, and for overkill, the government decided to request a wiretap.

See 4:09CR00305, Document 74 at 11.

Deleo's assertion is problematic for at least three reasons.  First, Thompson was not the only interceptee or violator identified in Spurgers' first affidavit.  There were other interceptees and violators, and Deleo has not shown that the Government had acquired enough evidence to justify indictments against them prior to the first Thompson wiretap.  Second, it is likely that the Government did not know the full extent of the gambling business when it sought the first Thompson wiretap.  Third, given the scant evidence cited by Deleo in support of his assertion, see 4:09CR00305, Document 74 at 12, the undersigned frankly has difficulty believing that the evidence would have justified an indictment against Thompson.

Notwithstanding the foregoing, the Government's showing of necessity must be tested in a "practical and commonsense fashion" and "considerable discretion rests with the judge to whom the wiretap application is made." See United States v. Daly, 535 F.2d at 438.  The undersigned has previously found that Spurgers' first affidavit satisfied the necessity requirement, and there is no need to revisit that finding.

Deleo also maintains that the Government failed to minimize the conversations he had with Thompson.  Deleo maintains that he spoke with Thompson several times after December 2, 2008, the day on which the first Thompson wiretap was authorized. Deleo maintains that "some of the conversations were approximate 3 minutes, but several of the phone calls that were monitored were between 10 and 15 minutes long." See 4:09CR00305, Document 74 at 15.

On December 15, 2008, the Government filed its first ten day progress report in connection with the first Thompson wiretap.  The report reflects that within seven days of the first Thompson wiretap being authorized, Deleo placed himself "on law enforcement's radar screen" when he and Thompson exchanged several calls.  The calls did not so much relate to Thompson's gambling business as they did to Deleo's involvement in trafficking cocaine with Thompson.  Thereafter, the Government could reasonably suspect that a call from Deleo might be related to cocaine trafficking and could therefore be properly intercepted.  In the second ten day progress report filed in connection with the first Thompson wiretap, the Government notified Judge Miller of

Deleo's apparent involvement in cocaine trafficking.  In Spurgers' second affidavit, he

named Deleo as among the interceptees and violators involved with distributing cocaine.

With regard to the calls specifically identified by Deleo as having not been

properly minimized, <u>see</u> 4:09CR00305, Document 15 at 13-14, the Government

apparently does not dispute that the calls were indeed monitored and related to some

non-criminal matters.  The Government nevertheless maintains that it properly did so.

It specifically represents the following:

> Agents are not required to listen to calls in isolation, and as they often do in cases involving lingo and attempts to conceal criminal activity, agents must piece together several pieces of knowledge in order to understand the context and potentially illicit purpose of an interception. The agents were also instructed that they could consider "Patterns of Involvement when minimizing …

> All of these factors–Deleo's role in organized crime, the fact that both Deleo and Thompson are convicted felons, the coded language and guarded tone in the calls, the reasonable [inferences] that could be drawn regarding the communications among Thompson, Deleo, and Tri Cam Le [an individual who apparently served as a "mule" but who had been stopped by officers with the Arkansas State Police and found to be in possession of a large amount of cocaine], the results of the traffic stop by [the] Arkansas State Police on December 12, 2008, and that the pattern of involvement between Deleo and Thompson appeared to relate only to criminal activities–weigh in favor of a determination that the interceptions of calls between Thompson and Deleo were reasonable and thus properly minimized.

<u>See</u> 4:09CR00305, Document 80 at 16.

The Government's position is persuasive and is adopted by the undersigned.  Deleo has failed to show that law enforcement agents acted objectively unreasonably in light of the particular circumstances.

GEORGE ALLEN THOMPSON.  George Allen Thompson has filed a motion to suppress in 4:10CR00094.  In the motion, he adopts the reasons for suppression advanced by the other defendants.  Because their reasons do not justify suppressing any of the evidence, additional consideration of his motion is not warranted.

RECOMMENDATION.  For the foregoing reasons, the undersigned recommends that the defendants' motions to suppress be denied in 4:09CR00265, Documents 69, 81, and 118;  in 4:09CR00305, Documents 58 and 75;  and in 4:10CR00094, Document 15.  All requested relief should be denied.

DATED this _____15_____ day of September, 2010.


_____
UNITED STATES MAGISTRATE JUDGE